UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JULIO CRUZ CAMACHO,

                      Plaintiff,

      v.

CITY OF BUFFALO, and
COUNTY OF ERIE,

                    Defendants.

_____

REPORT
and
RECOMMENDATION

18-CV-1318-JLS(F)

APPEARANCES:         NELSON S. TORRE, ESQ.
                       Attorney for Plaintiff
                       438 Main Street
                       Suite 910
                       Buffalo, New York 14202

                       CITY OF BUFFALO LAW DEPARTMENT
                       Attorney for Defendant City of Buffalo
                       MAEVE EILEEN HUGGINS
                       Suite 1112 City Hall
                       Buffalo, New York  14202

                       ERIE COUNTY ATTORNEY'S OFFICE
                       Attorney for Defendant County of Erie
                       JEREMY C. TOTH
                       95 Franklin Street
                       16th Floor
                       Buffalo, New York 14202

## **JURISDICTION**

On March 5, 2021, this case was referred to the undersigned for all pretrial matters including preparation of a report and recommendation on dispositive motions (Dkt. 34).  Presently before the court are four motions, including a motion for summary judgment filed by Defendant County of Erie ("the County") on February 24, 2021 (Dkt. 29), a motion for judgment on the pleadings and for summary judgment filed by

Defendant City of Buffalo ("the City") on February 25, 2021 (Dkt. 30), and two cross-motions for summary judgment filed by Plaintiff Julio Cruz Camacho ("Plaintiff") on June 2, 2021 (Dkts. 40, 41).

## BACKGROUND

Plaintiff commenced this civil rights action in New York Supreme Court, Erie County, on November 2, 2018 (Dkt. 1-1) ("Complaint"), alleging against the City and the County (together, "Defendants") four claims for relief related to his arrest on November 14, 2017 and subsequent detention at the Erie County Holding Center ("the Holding Center") until November 17, 2017, including claims under New York common law for false arrest and unlawful imprisonment, Complaint ¶¶ 16-21 ("First Claim"), and assault and battery, *id.* ¶¶ 22-23 ("Second Claim") (together, "the state law claims"), a civil rights claim for false arrest pursuant to 42 U.S.C. § 1983, *id.* ¶¶ 24-28 ("Third Claim"), and a civil rights claim for negligent hiring, training and supervision pursuant to 42 U.S.C. §§ 1981 and 1983, *id.* ¶¶ 29-31 ("Fourth Claim") (together, "the federal claims"). Plaintiff seeks compensatory and punitive damages, as well as an award of attorney's fees and costs. *Id.* at 12. On November 19, 2018, Defendants filed their respective answers (Dkts. 1-2 (City) and 1-3 (County)). On November 20, 2018, the County removed the action to this court (Dkt. 1).[1] Discovery concluded on January 25, 2021 (Dkt. 27).

---

[1] Normally, the "rule of unanimity" requires that "all removing defendants consent to removal within the statutory thirty-day period [for removal] . . . ." *Pietrangelo v. Alvas Corp.*, 686 F.3d 62, 66 (2d Cir. 2012). Although the City, which was served prior to the County's removing the action to this court, did not join in removing the action to this court, the rule of unanimity is a procedural defect that is waived where, as here, it is not raised by the non-removing party, Plaintiff, within 30 days after the notice of removal is filed. *Johnson v. Adams*, 2016 WL 1178754, at * 2 (N.D.N.Y. Mar. 23, 2016) ("Unlike a jurisdictional defect for lack of subject matter jurisdiction, which mandates remand upon discovery at any time before entry of final judgment, *see* 28 U.S.C. § 1447(c), a violation of a procedural rule, like the rule of unanimity, is subject to waiver if not timely raised." (citing *Borden v. Blue Cross & Blue Shield of W.N.Y.*, 418

On February 24, 2021, the County filed a motion for summary judgment (Dkt. 29) ("County's Motion"), attaching the Supporting Declaration of Assistant County Attorney Jeremy C. Toth (Dkt. 29-1) ("Toth Declaration"), exhibits A through H (Dkt. 29-2 through 29-8 and 29-12) ("County Exh(s). __"), a Statement of Undisputed Facts Pursuant to Local Rule 56 (Dkt. 29-9) ("County Statement of Facts"), and a Memorandum of Law in Support of the Motion for Summary Judgment (Dkt. 29-10) ("County's Memorandum"). On February 25, 2021, the City filed a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) ("Rule 12(c)") and for summary judgment pursuant to Fed.R.Civ.P. 56 (Dkt. 30) ("City's Motion"), attaching a Memorandum of Law In Support of the Motion for Judgment on the Pleadings and for Summary Judgment (Dkt. 30-1) ("City's Memorandum"), a Statement of Undisputed Facts Pursuant to Local Rule 56 (Dkt. 30-2) ("City Statement of Facts"), the Supporting Declaration of Assistant Corporation Counsel Maeve E. Huggins (Dkt. 30-3) ("Huggins Declaration"), and exhibits A through J (Dkts. 30-4 through 30-13) ("City Exh(s). __").

In opposition to the County's Motion and the City's Motion (together, "Defendants' Motions"), Plaintiff filed on June 2, 2021, cross-motions for summary judgment seeking summary judgment only on the state law claims.  (Dkt. 40) ("Plaintiff's Motion – City"), and Dkt. 41 ("Plaintiff's Motion – County").  Plaintiff's Motion – City, is supported by the Declaration of Nelson S. Torre (Dkt. 40-1) ("Torre Declaration - City "), attaching exhibits 1 through 26 (Dkts. 40-2 through 40-27) ("Plaintiff Exh(s).- City __"), a Statement of Undisputed Material Facts Pursuant to Local Rule 56 (Dkt. 40-28)

---

F.Supp.2d 266, 270 (W.D.N.Y. 2006)).  *See also Taylor v. Medtronic, Inc.*, __ F.4th __, 2021 WL 4468984, at *2 & n. 2 (2d Cir. 2021) (noting the failure to comply with the rule of unanimity, now codified at 28 U.S.C. § 1446(b), is not jurisdictional but is procedural and the defect may be waived absent a timely motion to remand based on the defect (citing cases)).

("Plaintiff's Undisputed Facts - City"); a Statement of Disputed Material Facts (Dkt. 40-29) ("Plaintiff's Disputed Facts - City"), and a Memorandum of Law in Opposition to the City's Motion for Judgment on the Pleadings and for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment on Liability (Dkt. 40-30) ("Plaintiff's Memorandum").  Plaintiff's Motion – County, is supported by the Declaration of Nelson S. Torre (Dkt. 41-1) ("Torre Declaration-County"), exhibits 1 through 26 (Dkts. 41-2 through 41-27) ("Plaintiff Exh(s).-County __"), a Statement of Undisputed Material Facts Pursuant to Local Rule 56 (Dkt. 41-28) ("Plaintiff's Undisputed Facts-County"); a Statement of Disputed Material Facts (Dkt. 41-29) ("Plaintiff's Disputed Facts-County"), and Plaintiff's Affidavit dated April 30, 2021 (Dkt. 41-30) ("Plaintiff Affidavit").  Plaintiff also filed on June 2, 2021, a duplicate copy of Plaintiff's Memorandum.  Dkt, 42 ("Plaintiff's Memorandum").[2]

On June 23, 2021, the County filed the Attorney Reply Declaration in Support of the County's Motion for Summary Judgment by Jeremy C. Toth (Dkt. 45) ("Toth Reply Declaration").  Also on June 23, 2021, the City filed a Memorandum of Law in Opposition to Plaintiff's Cross-Motion And In Further Support of the City's Motion (Dkt. 46) ("City's Reply"), attaching a Response to Plaintiff's Statement of Material Facts (Dkt. 46-1) ("City's Responding Statement of Facts").  On July 9, 2021, the County filed its Memorandum of Law in Opposition to the Plaintiff's Motion for Summary Judgment (Dkt. 47-4) ("County's Reply"), attaching the Attorney Declaration in Opposition to Plaintiff's Motion for Summary Judgment by Jeremy C. Toth (Dkt. 47) ("Toth Opposition

---

[2] Because Plaintiff filed the same memorandum of law in support of both Plaintiff's Motion – City and Plaintiff's Motion – County, the court references only "Plaintiff's Memorandum" regardless of which motion is being discussed.

Declaration"), exhibits A through B (Dkts. 47-1 and 47-2) ("County Opposition Exh(s).

__"), and the County's Objections to Plaintiff's Statement of Undisputed Material Facts

(Dkt. 47-3) ("County Responding Statement of Facts").  On July 23, 2021, Plaintiff filed a

Memorandum of Law in Reply to the County's Response and in Further Support of

Cross-Motion for Summary Judgment (Dkt. 49) ("Plaintiff's Reply").  Oral argument was

deemed unnecessary.

Based on the following, the County's Motion should be GRANTED, the City's

Motion should be GRANTED as to summary judgment and should be DISMISSED as

moot as to judgment on the pleadings; the Plaintiff's Motion-City should be DENIED,

and Plaintiff's Motion-County should be DENIED.


### FACTS[3]

At noon on November 14, 2017, Plaintiff was driving home from a job interview in

Blasdell, New York to his residence in the City of Buffalo.  City Exh. D at 23-25.  At

some point, he became disoriented and inadvertently drove onto the Peace Bridge,

which connects the United States to Canada.  *Id.* at 25; City Statement of Facts ¶ 1.

Without making a U-turn to return to the United States, Plaintiff reached the Canadian

border and spoke with a Canadian customs agent.  City Exh. D at 32.  After Plaintiff

provided his driver's license, the agent informed him that he needed to wait before he

could turn around.  *Id.* at 32, 37.  A few minutes later, other officers with Canada's

customs agency arrived and told Plaintiff they were detaining him for an investigation.

*Id.* at 28-29, 34-35.  During the ensuing interview, Plaintiff learned that the agency was

---

[3] Taken from the pleadings and motion papers filed in this action.

"looking for a person with [his] name" who had allegedly committed multiple murders
murder in Kentucky ("the murder suspect"). *Id.* at 36-37. Plaintiff testified that he was
detained for several hours while Canadian authorities investigated the possibility that
Plaintiff was the murder suspect. *Id.* at 37. In Plaintiff's version of events, Canadian
authorities released him once they were able to obtain a photograph of the suspect from
Kentucky police and confirm that Plaintiff was "not the wanted person." Plaintiff Affidavit
¶¶ 5, 6. Plaintiff claims that Canadian authorities provided him with a letter ("the letter")
stating that "according to the investigation made by Canadian Immigration, they
determined that [the wanted] person wasn't me." City Exh. D at 66-67.

Upon returning to the United States border, Plaintiff provided the letter to U.S.
Customs and Border Protection agents ("CBP officer(s)"). *Id.* at 40. Nevertheless,
Plaintiff was detained at the U.S. border. *Id.* CBP officers informed him that a person
by the name of Antonio Sanchez ("Sanchez")[4] had an active warrant for a murder
charge from Kentucky. [5] *Id.* at 40, 47, 48. The murder suspect had the same birthday
as Plaintiff and used Plaintiff's name as one of his aliases. *See* Plaintiff Exh.-City 16 at
16; Plaintiff Exh.-City 2 at 1. Plaintiff protested that he was not Sanchez, and Plaintiff
provided numerous documents to CBP officers to verify his identity, including his birth
certificate, Social Security card, "IDs from Puerto Rico," and his Florida driver's license.
*Id.* at 46, 50. In his affidavit, Plaintiff also claims to have provided CBP officers with a
2009 police report from Puerto Rico in which he was erroneously detained, and

---

[4] Sanchez and the murder suspect are the same person.
[5] In fact, there were then two active warrant entries in the National Crime Information Center ("NCIC")
database. The first indicated that Antonio Sanchez had an active felony warrant in connection with a
triple murder in Kentucky and had used the alias "Julio Cruz Camacho," City Exh. I at 6 ("Kentucky
warrant"), and that he was wanted by the Lexington County Sheriff. *Id.* The second entry lists the same
biographical information and states that the Louisville office of the Federal Bureau of Investigation ("FBI")
was seeking Sanchez on an active warrant for "flight to avoid prosecution." *Id.* at 7 ("federal warrant").

subsequently released, based on the same warrant for Sanchez.  Plaintiff Affidavit 43 ¶¶ 6-7.  In addition, Plaintiff states that he observed that the CBP officers had the photograph of the murder suspect—the same photograph that had led Canadian authorities to conclude that Plaintiff was not murder suspect.  *Id.* ¶ 6.

In the meantime, the Buffalo Police Department ("BPD") received a call from a CBP official.  *See* County Exh. A.  The agent told the BPD dispatcher that he "had a gentleman here [the Peace Bridge]" with a "full extradition warrant for homicide out of Kentucky."  *Id.*  The agent stated that "everything's verified," that he "spoke to them," [the Kentucky authorities] and that "they will extradite."  *Id.*  The CBP official asked whether the Buffalo Police "would be willing to send someone over," and the dispatcher responded that they would do so.  *Id.*  The dispatcher requested that Buffalo Police Officer Ronny Blatchford ("Officer Blatchford") respond to the call, and at approximately 9:30 P.M. on November 14, 2017, Officer Blatchford arrived at the Peace Bridge.[6]  City Exh. I at 3.

The parties dispute the Buffalo Police Department's procedure for processing an arrestee with a foreign arrest warrant.  At his deposition, Officer Blatchford testified that his understanding of the normal processing practice was that, if there were no "local" charges, the transporting officer was to take the arrestee directly to the Erie County Holding Center ("the Holding Center") for processing and holding.  County Exh. B at 53, 76-77, 82.  In contrast, BPD Detective Mary Patricia Kaempf ("Detective Kaempf")— then a detective in the extradition unit at the Buffalo Police Department—explained at her deposition that the proper procedure was to take the arrestee to the department's

---

[6] Officer Blatchford was authorized pursuant to N.Y. Crim.Proc.Law § 570.22 to arrest the subject of a warrant seeking extradition of the warrant's subject.

central booking station for processing, including taking the arrestee's fingerprints and photograph and completing any necessary paperwork for the arrest, *before* transporting the arrestee to the Holding Center.  County Exh. C at 25.

In any event, after Officer Blatchford arrived at the Peace Bridge, he talked to the CBP officers, conducted an inventory search of Plaintiff's vehicle, had the vehicle impounded, and then transported Plaintiff directly to the Holding Center.[7]  County Exh. B at 46-47.  Plaintiff testified that Officer Blatchford placed him in handcuffs during his transport to the Holding Center.  City Exh. D at 49.  In his affidavit, Plaintiff claims that, while in transit to the Holding Center, he protested his innocence and showed his identification papers and documents to Officer Blatchford, who simply "ignored" it.[8] Plaintiff Affidavit ¶ 8.

By approximately 10:30 P.M. on November 14, 2017, Officer Blatchford had transported Plaintiff to the Holding Center, City Exh. I at 3, where Erie County Sheriff's deputies took custody of Plaintiff.  City Exh. D at 55.  Upon delivering Plaintiff to the Holding Center, Officer Blatchford signed the back of a copy of the federal warrant for the arrest of the murder suspect and provided the copy to the receiving deputy. Plaintiff's Exh. 16 at 7-8; Sgt. Diamond Deposition Tr.[9] at 119-20.  Consistent with their usual procedure, the deputies ran a warrant check in the NCIC system and confirmed

---

[7]  In a notation of the arrest record, Officer Blatchford states that bullets were found in Plaintiff's vehicle and that Plaintiff had "a weapon and drugs taken from him by Canadian customs."  City Exh. I at 3.  At his deposition, Officer Blatchford could not recall how he obtained this information, but he assumed that CBP officers provided it.  County Exh. B at 20, 112.  Because Defendants do not argue these statements provided probable cause for Plaintiff's arrest and detention, the court need not address them.
[8] There is no evidence that Officer Blatchford saw the letter or the photograph that caused Canadian authorities to release Plaintiff.  *See id.* ¶¶ 7-9; County Exh. H at 49, 55.
[9] References to "Sgt. Diamond Dep. Tr." are to the pages of the transcript of the deposition testimony of Erie County Sheriff Deputy Sergeant Anthony Diamond, filed as Plaintiff's Exh. 26 – City, and Plaintiff's Exh. 26 – County (respectively, Dkts. 40-26 and 41-26).

the existence of two warrants for Sanchez, the murder suspect from Kentucky, including the federal warrant and the Kentucky warrant.  Dep. Tr. of Anthony Diamond at 106-08;[10] NCIC Report[11] at 21.  The deputies then processed Plaintiff into the Holding Center, which included a strip and body-cavity search.  Plaintiff Statement of Disputed Facts-City ¶ 8; Diamond Dep. Tr. at 10-12.  The deputies did not, at that time, complete paperwork for Plaintiff's arrest, take his fingerprints or photograph, or contact the Kentucky police who transmitted the arrest warrant information.  The policy at the Holding Center was that Sheriff's deputies would not undertake such confirmation unless the arresting agency explicitly requested it; rather, this responsibility ordinarily was on the arresting agency—here, the Buffalo Police Department—to fingerprint and photograph the suspect and coordinate extradition with the "wanting agency."  Diamond Dep. Tr. at 47, 82.  Furthermore, it was the arresting agency's responsibility to verify a suspect's identity and investigate any claim of mistaken identity with the wanting agency.  *Id.* at 47, 97, 104.

No further action was taken on Plaintiff's arrest by either the BPD or Erie County Sheriff on November 15, 2017.[12]  Plaintiff maintains that Defendants' policies—the City's alleged policy of taking suspects to the Holding Center without processing them at the central booking office, and the County's alleged policy of accepting such suspects without booking them—caused this hiatus on November 15, 2017, which thereby delayed Plaintiff's correct identification, exoneration, and eventual release.  Plaintiff

---

[10] References to "Diamond Dep. Tr." are to pages of the transcript of the deposition of Erie County Sheriff Sergeant Anthony Diamond ("Diamond"), Erie County Sheriff Sergeant assigned to the Holding Center where Diamond worked in booking area, filed as County Exh. E (Dkt. 29-5).
[11] References to "NCIC Report" are to pages of the portion of the NCIC Report containing information relevant to this action, filed as County Exh. F (Dkt. 29-6).
[12] The record does not indicate why no action concerning Plaintiff occurred on November 15, 2017.

Reply Memorandum at 5-6; Diamond Dep. Tr. at 47, 82; Plaintiff's Dep. Tr.[13] at 53, 76-77, 82.

On the morning of November 16, 2017, Detective Kaempf became involved in the case, having been informed by the Holding Center of a "hit" on Sanchez, the murder suspect, in the NCIC database. City Exh. I at 4. Because Officer Blatchford did not initially take Plaintiff to the BPD's central booking station, Detective Kaempf asked the Sheriff's deputies at the Holding Center to take Plaintiff's fingerprints and mugshot, *id.* at 4, and she also sent a fax to the Buffalo Police central records unit, directing that, once booking was complete, the central records unit should contact the Lexington, Kentucky Sheriff's Department ("Lexington Sheriff"), the agency which had entered the state warrant on NCIC. *Id.* at 4-6.

On November 16, 2017, at 9:53 A.M., the BPD central records unit sent a message to the Lexington Sheriff, asking that it fax a copy of the warrant and confirm that it would extradite Sanchez. *Id.* at 8. Two minutes later, the Lexington Sheriff stated that the warrant "is valid" and that it would extradite—but it did not provide a copy of the warrant. *Id.* at 10.

At 2:08 P.M. on November 16, 2017, the Erie County District Attorney's Office received a notice of motion for bail from Plaintiff's attorney, who asserted that he had documentation and witnesses who could establish that Plaintiff was not Sanchez, the wanted person on the Kentucky and federal warrants. Plaintiff Exh.- City 12 at 1.

At 2:16 P.M. on November 16, 2017, Detective Tye Chavies ("Detective Chavies") of the Kentucky State Police e-mailed Detective Kaempf a 2003 photograph of Antonio

---

[13] References to "Plaintiff's Dep. Tr." are to pages of the transcript of Plaintiff's deposition, filed as County Exh. B (Dkt. 29-2).

Sanchez, which Detective Kaempf then forwarded to Erie County Sheriff's Deputy Jerome Sanchez ("Deputy Sanchez"). Plaintiff Exh.-City 19 at 6-8. Deputy Sanchez responded to Detective Kaempf with an e-mail that displayed Sanchez's photograph next to Plaintiff's mugshot. *See id.* at 11. Detective Kaempf forwarded the photographs to Detective Chavies, writing, "This is a comparison – What do you think?" *Id.* at 13. At her deposition, Detective Kaempf testified that it was necessary to compare the photographs to establish whether Plaintiff was Antonio Sanchez, the wanted person, because the Kentucky State Police did not have fingerprints of Sanchez to compare with Plaintiff's fingerprints. County Exh. D at 58. By this time Detective Kaempf was aware of the bail motion and Plaintiff's claim of mistaken identity, having conferred with the Erie County District Attorney's Office about the case and sent the side-by-side photo comparison to an investigator and assistant District Attorney there. *See* Plaintiff Exh.-City 19 at 12, 15; County Exh. D at 38. At 4:42 P.M. on November 16, 2017, Detective Chavies responded, asking whether Detective Kaempf could "send [him] the info on [Plaintiff's] Florida [driver's license that Plaintiff] produced." Plaintiff Exh.-City 19 at 16. Detective Kaempf stated, "I'll try." *Id.* at 17. Before Detective Kaempf could do so, at 5:17 P.M. on November 16, 2017, Detective Chavies notified Detective Kaempf that Chavies could not "confirm this is our guy" and that his agency would be faxing a letter to Detective Kaempf in the morning. *Id.* at 18. Despite this notification, Detective Kaempf took no immediate action to have Plaintiff released.

At 5:53 A.M. on November 17, 2017, Detective Kaempf sent an e-mail to another officer within the Buffalo Police Department recounting Plaintiff's case. Detective Kaempf wrote, "[W]as in Crime Analysis still trying to figure out if the fugitive is the same

11

guy or not!  We don't think so – wasted my whole day!"  *Id.* at 20.  Later that morning,

the Buffalo Police Department received a formal letter from the Kentucky State Police,

advising they were not longer requesting "Julio C. Camacho, a Hispanic male in your

custody for our investigation," be held for extradition purposes because the Kentucky

State Police was not "certain that this male is in fact the individual wanted for our case."

Plaintiff Exh.-City 8 at 1.  Upon receipt of the letter, which was provided by Kentucky

State Police, at 1:00 P.M. on November 17, 2017, the Holding Center released Plaintiff.

City Exh. F at 82; City's Exh. C (Dkt. 30-6) at 2.


## DISCUSSION

### 1.    Plaintiff's Claims and County's Liability

In the Complaint Plaintiff separately denominates four claims for relief, including

two state common law claims for false arrest and unlawful imprisonment (First Claim),

and for assault and battery (Second Claim), a § 1983 claim for false arrest (Third Claim)

and a § 1981 and § 1983 claim for negligent hiring, training, supervision, and

supervisory liability (Fourth Claim).  Plaintiff asserts all claims against both City and

County ("Defendants"), but names no individual City or County employees, such as

Officer Blatchford and Deputy Diamond, as defendants.

Preliminarily, insofar as Plaintiff sues the County, the County argues that it

cannot be held liable for the acts of Erie County Sheriff or the Sheriff deputies.  County's

Memorandum at 3-6.  Other than implying the County is liable to Plaintiff based on the

County's ownership of the Holding Center, Plaintiff's Memorandum – County at 3,

Plaintiff does not oppose this argument.

Before 1989, article XIII, § 13(a) of the New York State Constitution provided that a "county shall never be made responsible for the acts of the sheriff." *Barr v. Albany Cty.*, 406 N.E.2d 481, 484 (N.Y. 1980). This provision had been construed to immunize a "county from liability for acts . . . of the Sheriff's deputies," though a county could voluntarily assume that responsibility. *Id.* In 1989, the State Constitution was amended to remove that provision. *DiJoseph v. Erie Cty.*, 2020 WL 4194136, at *8 (W.D.N.Y. July 21, 2020). This amendment, however, did not have the effect of imposing "liability upon the county for the acts of the Sheriff or his deputies on a theory of repondeat superior," but instead "merely allow[ed] a county to accept responsibilities for the [tortious] acts of the Sheriff." *Marashian v. City of Utica*, 626 N.Y.S.2d 646, 647 (4th Dep't 1995). In the instant case, that the County has never enacted a provision adopting vicarious liability for the acts of the Sheriff or Sheriff deputies for state law-based claims is not disputed. *See DiJoseph*, 2020 WL 4194136, at *10; *Belsito v. Cty. Of Erie*, 2019 WL 6292143, at *4 (W.D.N.Y. Nov. 25, 2019) (collecting cases); *Villar v. Cty. of Erie*, 5 N.Y.S.3d 747, 748 (4th Dep't 2015). Accordingly, under New York law, the County cannot be held vicariously liable for the acts of the Sheriff's deputies. *See, e.g.*, *Hall v. Monroe Cty.*, 488 N.Y.S.2d 940, 940 (4th Dep't 1985) (county not liable for false arrest and imprisonment where sheriff detained plaintiff pursuant to a previously withdrawn bench warrant).[14] Nevertheless, because the action is before the court for report and recommendation on the pending dispositive motions, the court addresses the merits of the claims, including both the federal § 1981 and § 1983 claims and the state

---

[14] Plaintiff does not contend his *Monell* claim would be enforceable against the County based on the Sheriff's § 1983 liability pursuant to *Monell*. The Sheriff is not a municipal corporation and thus is not within the scope of *Monell* but is suable only for personal involvement.

law claims, asserted against the County in the interest of completeness should the

District Judge disagree with the recommendation that all claims be dismissed as against

the County.

## 2.    Summary Judgment

Both Defendants seek summary judgment on all of Plaintiff's claims while Plaintiff

seeks summary judgment of only Plaintiff's state law claims.  Summary judgment on a

claim or defense will be granted when a moving party demonstrates that there are no

genuine issues as to any material fact and that a moving party is entitled to judgment as

a matter of law.  Fed. R. Civ. P. 56(a) and (b) ("Rule 56__"); *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51

(1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).  The

court is required to construe the evidence in the light most favorable to the non-moving

party, *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011), and summary judgment

may not be granted based on a credibility assessment.  *See Reyes v. Lincoln*

*Automotive Financial Services*, 861 F.3d 51, 55 (2d Cir. 2017) ("Adverse parties

commonly advance conflicting versions of the events throughout a course of litigation.

In such instances on summary judgment, the court is required to resolve all ambiguities

and draw all permissible factual inferences in favor of the party against whom summary

judgment is sought." (citations, quotation marks, and brackets omitted)).  *See also Kee*

*v. City of New York*, 12 F.4th 150, 166 (2d Cir. Aug. 30, 2021) ("With respect to the

evidence, at the summary judgment stage, the district court is not permitted to make

credibility determinations or weigh the evidence . . . ." (citing *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. at 255).  The party moving for summary judgment bears the burden of

establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). "A fact is material if it 'might affect the outcome of the suit under governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).  Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).   "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."  *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).  "An issue of fact is genuine and material if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133,137 (2d Cir. 2009)).

In the instant case, the County argues in support of summary judgment on the First and Third Claims asserting false arrest and unlawful imprisonment under, respectively, New York law and § 1983 that the County did not arrest Plaintiff, County's Memorandum at 6-7, and Plaintiff's arrest was nevertheless supported by probable cause. *Id*. at 7-10. In support of summary judgment on the Second Claim alleging assault and battery under state law, the County argues the record is devoid of any facts showing Plaintiff was assaulted or subjected to any excessive force by County employees in connection with his arrest and detention, *id*. at 10-11, and Plaintiff's Fourth Claim for failure to train and supervise must be dismissed for want of any evidence that the County was aware of a propensity for any County officer to act unlawfully. *Id*. at 11-13. Further, the County maintains Plaintiff has failed to establish the policy or practice necessary to establish a claim against the County pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) ("*Monell*") (local governments cannot be held liable for § 1983 violations by employees under a theory of respondeat superior, but can be held liable only when such violation arises form a governmental policy or custom). The City argues that with regard to Plaintiff's § 1983 claims, the record is devoid of any evidence of a specific policy or custom from which the alleged constitutional harm flowed to Plaintiff, City's Memorandum at 9-13, 14-15, Plaintiff's false arrest and false imprisonment claims are defeated by probable cause supporting Plaintiff's arrest, *id*. at 15-16, qualified immunity shields the City from liability on the §

1983 claims, *id*. at 16-19, Plaintiff was not arrested by a City employee, but by CBP, *id*. at 18-19, and there is no evidence supporting Plaintiff's claim that the City had the requisite notice of any training or supervision deficiency to support Plaintiff's § 1981 claim. *Id*. at 19-20. The City further argues Plaintiff failed to adequately set forth in a notice of claim the theories of liability on which Plaintiff sues here which defect bars Plaintiff's state law claims against the City. *Id*. at 13-14. Plaintiff argues in support of summary judgment on his state law claims that the notice of claim against the City was sufficient, Plaintiff's Memorandum at 13-15, and that Plaintiff's arrest and detention were not supported by probable cause, *id*., at 15-17.

### A.    Timeliness of Plaintiff's Cross-motions

At the outset, Defendants argue that Plaintiff's cross-motions for summary judgment, filed June 2, 2021, must be denied as untimely because Plaintiff, without articulating any good cause or excusable neglect for the delay, Plaintiff filed his cross-motions after the February 25, 2021 deadline set by the December 11, 2020 Scheduling Order (Dkt 27) ("Scheduling Order"). City's Response at 5; Toth Opposition Declaration[15] at 2-3. Plaintiff does not directly respond to the Defendants' arguments regarding timeliness nor articulate the reason for his delay, but argues any "procedural objections" to his cross-motion "should be disregarded" because Rule 56(f) permits a court to grant summary judgment *sua sponte*. Plaintiff's Reply at 8.

The Scheduling Order in this case set February 25, 2021 as the deadline for filing dispositive motions, and that such deadlines "shall not be modified except upon a showing of good cause." *Holmes v. Grubman*, 568 F.3d 329, 334-45 (2d Cir. 2009)

---

[15] The County's argument regarding the timeliness of Plaintiffs' cross-motions is found only in the Toth Opposition Declaration.

(quoting Fed.R.Civ.P. 16(b)).  "A finding of good cause depends on the diligence of the moving party," *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003), and "[t]he inquiry focuses on the moving party's reason for requesting the extension."  *Pyke v. Cuomo*, 2004 WL 1083244, at *2 (N.D.N.Y. May 12, 2004).

After Defendants timely filed their respective summary judgment motions, Plaintiff requested, and was granted, extensions of time to respond to the motions with the last extension requiring Plaintiff respond by June 2, 2021.  (Dkt. 39).  On that date, however, Plaintiff filed his combined oppositions to Defendants' motions and cross-motions (Dkts. 40, 41), and Defendants maintain they were never informed Plaintiff intended to file the cross-motions.  City's Response at 5; Toth Opposition Memorandum at 2-3.

"While [a court] may strike a cross-motion for summary judgment when the moving party does not meet the deadline for filing dispositive motions," *Shantou Real Lingerie Mfg. Co. v. Native Grp. Int'l*, 401 F. Supp. 3d 433, 437 n.3 (S.D.N.Y. 2018), courts in this Circuit have exercised their discretion to consider an untimely cross-motion for summary judgment where the issues it presents are "coextensive" with those raised in the opposing party's motion for summary judgment.  *Fin. Fed. Credit, Inc. v. Crane Consultants, LLC*, 21 F. Supp. 3d 264, 269 (W.D.N.Y. 2014); *see also* Fed.R.Civ.P.56(f)(1), (3) (authorizing a court to grant summary judgment for a nonmovant or consider summary judgment *sua sponte*).   The opposing party suffers little prejudice in that situation, as it cannot claim to have been unaware of or surprised by the court's consideration of those issues.  *See Tackman v. Goord*, 2005 WL 2347111, at *34 (W.D.N.Y. Sept. 26, 2005).  In addition, to the extent the cross-motion is meritorious, consideration of the cross-motion narrows the issues for trial and ensures

that claims are resolved on their merits. *See Hahnel v. United States*, 782 F. Supp. 2d 20, 30-31 (W.D.N.Y. 2011); *Shantou*, 401 F. Supp. 3d at 437 n.3; *Fin. Fed. Credit*, 21 F. Supp. 3d at 269.

Here, because Plaintiff's cross-motions address the same issues that Defendants address in their motions, such issues will be evaluated even if the cross-motions are rejected as untimely. Under these circumstances, the interests of judicial economy and fairness to the parties militate in favor of consideration of Plaintiff's cross-motions which therefore will not be denied on this ground.[16]

### B.    § 1981 Claim

Insofar as Plaintiff's Fourth Claim for negligent hiring, training, supervision and supervisory liability is asserted pursuant to 42 U.S.C. § 1981 ("§ 1981"), § 1981 "reach[es] 'only purposeful discrimination.'" *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 80 (2d Cir. 2021) (quoting *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982) ("§ 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination")). Accordingly, to avoid summary judgment on his § 1981 claim, the Plaintiff must point to evidence establishing the existence of a genuine issue of material fact that Defendants, in their alleged negligence in hiring, training, and supervising their employees, nevertheless intended to discriminate against Plaintiff based on his race. *Francis*, 992 F.3d at 80. The record in the instant case, however, is bereft of any such evidence, nor does Plaintiff even assert the claimed § 1981 violation

---

[16] In a similar vein, Defendants allege other technical errors, including that Plaintiff's opposition brief exceeds the permitted page limit and that his responsive Rule 56 Statements of Fact do not comply with the Local Rules. City Reply Memorandum at 3-4; Toth Reply Declaration at 4. The undersigned can discern no prejudice from these alleged errors and recommends that no relief be granted on those grounds. *See Grella v. Avis Budget Grp., Inc.*, 2016 WL 638748, at *3 (S.D.N.Y. Feb. 11, 2016).

was intentional and based on his race or ethnicity.  Accordingly, summary judgment on this aspect of the Fourth Claim should be GRANTED as to Defendants.

### C.    § 1983 Claims and Municipal Liability

Plaintiff also asserts against Defendants claims for false arrest and unlawful imprisonment, and for failure to train and supervise are asserted pursuant to 42 U.S.C. § 1983 ("§ 1983"), which permits imposing civil liability upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws of the United States.  *Patterson v. County of Oneida, New York*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting 42 U.S.C. § 1983).  Section 1983, however, "'is not itself a source of substantive rights.'"  *Id*. (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)).  Rather, § 1983 "merely provides 'a method for vindicating federal rights elsewhere conferred' ...."  *Id*.  To succeed on a § 1983 claim, a plaintiff must establish the challenged conduct "(1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States."  *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997).  Further, it is basic that liability under § 1983 requires a defendant's personal involvement in the alleged deprivation of a federal right. *See Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) ("To establish a section 1983 claim, 'a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity.'" (quoting *Patterson*, 375 F.3d at 229)).

Where, as here, § 1983 claims are asserted against municipalities, a municipality may not be held vicariously liable for the discriminatory or unconstitutional conduct of its

agents or employees.[17]  *See Reynolds v. Giuliani*, 506 F.3d 183, 190 (2d Cir. 2007);

*Patterson*, 375 F.3d at 226.  Instead, municipal liability under § 1983 is governed by the

standard set forth in *Monell*, which requires the plaintiff show the "challenged acts were

performed pursuant to a municipal policy or custom."  *Patterson*, 375 F.3d at 226; *see*

*Cash v. Cty. of Erie.*, 654 F.3d 324, 334 (2d Cir. 2011) (stating that a "plaintiff must

demonstrate that, through its deliberate conduct, the municipality was the moving force

behind the alleged injury" (internal quotation marks omitted)).  There are three elements

to a *Monell* claim against a municipality including "(1) an official policy or custom that (2)

causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Batista v.*

*Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)); *see also Connick v. Thompson*, 563 U.S.

51, 60-61 (2011) ("Plaintiffs who seek to impose liability on local governments under §

1983 must prove that 'action pursuant to official municipal policy' caused their injury."

(quoting *Monell*, 436 U.S. at 691)).

    Defendants argue Plaintiff has failed to identify a policy, custom, or practice to

subject them to liability for false arrest under § 1983 and *Monell*.  Plaintiff responds that

he has sufficiently identified such policies.  Specifically, he claims that the City had a

policy of taking suspects with foreign arrest warrants directly to the Holding Center, and

the County had a policy of accepting such suspects, without first ensuring that they

were properly booked and processed.  *See* Plaintiff's Memorandum-City at 22-23;

---

[17] Although *Monell* provides a municipality cannot be held liable unless there is an underlying
constitutional violation caused by a municipal policy or custom, the individual officer or employee who
caused the violation is not a necessary party to the litigation.  *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d
Cir. 2013) (rejecting argument that a plaintiff must obtain a judgment against the individual tortfeasors to
establish the municipality's liability under *Monell*, stating the plaintiff need not sue the individual
tortfeasors but may proceed solely against the municipality).  However, if no *Monell* liability accrues
against a municipal defendant, in the absence of an individual defendant whose § 1983 liability is
established, a plaintiff is without a § 1983 remedy.

Plaintiff Reply Memorandum at 5. Plaintiff asserts that these policies caused delays in his identification and resulted in an "unnecessarily prolonged incarceration." Plaintiff Reply Memorandum at 6.

"A municipal policy [or custom] may be pronounced or tacit and reflected in either action or inaction." *Cash*, 654 F.3d at 334. When the plaintiff alleges municipal inaction is to blame, the municipality may be held liable only if its inaction "amounts to deliberate indifference to the rights of persons with whom [the employees] come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989); *see also Reynolds*, 506 F.3d at 192. It is settled that a municipality can be held liable under § 1983 if the deprivation of federal civil rights is pursuant to a governmental custom or policy of the relevant municipality. *Monell*, 436 U.S. at 694. Absent such a custom, policy, or usage, however, a municipality cannot be held liable under § 1983 based on *respondeat superior* for the tortious conduct of its employee. *Id*. It is also settled that a *Monell* claim requires "the existence of a formal policy which is officially endorsed by the municipality, or a practice so persistent and widespread that it constitutes a custom or usage of which supervisory authorities must have been aware, or that a municipal custom, policy, or usage can be inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Iacovangelo v.Correctional Medical Care*, 624 Fed.Appx. 10, 13-14 (2d Cir. 2015) (citing *Jones v. Town of East Haven,* 691 F.3d 72, 80–81 (2d Cir.2012)). Such a custom or policy may also be established if the challenged conduct was by government officials responsible for establishing municipal policies. *Norton v. Town of Islip*, 678 Fed.Appx. 17, 21 (2d Cir. Feb. 1, 2017) ("a plaintiff can establish that his constitutional right was violated [by a municipality] because of a

single decision by a municipal official who is 'responsible for establishing final policy with respect to the subject matter in question") (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986)).

In the instant case, Plaintiff fails to point to any evidence supporting his *Monell* claims based on the existence of a formal policy, a widespread and persistent practice establishing a custom or usage of which supervisory authorities must have been aware, or supervisory deliberate indifference from which a municipal custom, policy, or usage can be inferred. Nor is there any evidence that any of the individual BPD officers or Sheriff deputies involved in arresting and detaining Plaintiff held positions at the policy-making level as required for liability based on an isolated action. *Norton*, 678 Fed.Appx. at 21 (action by individual officer does not establish required policy or custom).

Further, municipal liability under § 1983 for "violation of a person's civil rights only if the moving force behind that violation was an official policy or custom of the municipality." *Williams v. Town of Southington*, 205 F.3d 1327 (2d Cir. 2000) (table op.). Put differently, the plaintiff must establish a "causal connection between the policy and the alleged civil rights violation." *Id.*; *see also Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (stating that a municipal policy must have "caused a constitutional tort"). Here, Plaintiff has failed to establish a material issue of fact supporting a causal connection between the booking and processing policies he identifies and the constitutional wrong at issue—his false arrest without probable cause. To demonstrate that causal connection, Plaintiff would need to show that some policy or practice was the "moving force behind the officers' actions," *i.e.*, Officer Blatchford's decision to detain him and the Sheriff's deputies' decision to confine him without adequate

justification. *Batista v. Rodriguez*, 702 F.2d 393, 399 (2d Cir. 1983) (requiring the subject policy be the "moving force" behind the law enforcement officers' actions for liability against the defendant municipality) (internal quotation marks omitted); *see, e.g.*, *Biton v. City of New York*, 416 F. Supp. 3d 244, 248 (E.D.N.Y. 2018) (theorizing that municipality could be held liable for false arrest under § 1983 if the municipal police department had a policy or practice of "arresting individuals without probable cause to satisfy arrest quotas").  By contrast, Plaintiff alleges not that his arrest resulted from any policy condoned by Defendants but, rather, from Officer Blatchford's failure to follow the established policy, described by Detective Kaempf at her deposition, that all arrests, including those picked up on foreign arrest warrants, were to be taken to Buffalo Police Central Booking Office for fingerprinting, photographing, and taking of pedigree information so as to identify the arrestee, prior to being transported to the Holding Center.  County Exh. C at 25.  Accordingly, this claim fails because it is not predicated on an unconstitutional policy or practice, but on an alleged failure to follow an established policy or practice, the constitutionality of which Plaintiff does not question here.  In this case, Plaintiff's alleged false arrest preceded the asserted failure to follow the proper booking procedures applicable to fugitive warrants, thus negating the required causal nexus between Plaintiff's arrest and the actions taken pursuant to the unconstitutional policies or practices upon which Plaintiff relies.

Summary judgment should therefore be GRANTED as to Defendants as to Plaintiff's § 1983 claims asserted against the City and the County for lack of any evidence the alleged unlawful conduct by City or County employees was pursuant to any municipal policy as required for *Monell* liability.

### D.    Merits of Federal Claims

Alternatively, even assuming Plaintiff's arrest and detention resulted from a policy or practice required for *Monell* liability against Defendants, Defendants are entitled to summary judgment on the merits of Plaintiff's § 1983 claims.

### 1.    False Arrest

Plaintiff alleges his arrest was not supported by probable cause in violation of the Fourth Amendment prohibition against unreasonable seizure because it was not based on a valid warrant and Plaintiff's claims of mistaken identity were not properly investigated prior to his arrest.  Complaint, Third Claim.  Defendants argue in support of summary judgment that Plaintiff's arrest was supported by probable cause which defeats Plaintiff's claims for false arrest and unlawful imprisonment.  City's Memorandum at 14-16; County's Memorandum at 7-10 .  In opposition, Plaintiff maintains the federal arrest warrant on which Plaintiff was arrested had been withdrawn several years prior to his arrest and, thus, did not support the arrest, Plaintiff's Memorandum at 15-18; and that had Plaintiff's protestations of innocence and documentation Plaintiff carried to establish Plaintiff was not the murder suspect, been considered, the arrest never would have occurred.  *Id*. at 18-19.

"A Section 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted); *see also Harrison v. Cty. of Nassau*, 804 Fed.Appx. 24, 26–27 (2d Cir. 2020) (the elements necessary to prove false arrest under § 1983 are substantially the same as the elements for false

arrest under New York law).  Further, under both federal and New York law, a claim for false arrest is synonymous with a claim for false imprisonment.  *See Jenkins v. City of New York*, 478 F.3d 76, 88 (2d Cir. 2007) ("False arrest is simply false imprisonment accomplished by means of an unlawful arrest." (citing 59 N.Y. Jur.2d False Imprisonment § 1 ("False arrest and false imprisonment are largely synonymous because an imprisonment starts at the moment of arrest.")).

"Under New York law, the elements of a false arrest and false imprisonment claim are: '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) (quoting *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016) (brackets and internal quotation marks omitted), and citing *see Smith v. County of Nassau*, 311 N.E.2d 489, 492 (N.Y. 1974) (listing same elements for false arrest as false imprisonment)).  An arrest of a criminal suspect by a law enforcement officer with probable cause, however, constitutes a "privileged" confinement for purposes of that analysis.  *Decker v. Campus*, 981 F. Supp. 851, 856 (S.D.N.Y. 1997).  Thus, the existence of probable cause to arrest is a complete defense to an action for false arrest when the arrest is conducted by a law enforcement officer.  *Harrison*, 804 Fed.Appx. at 27 ("[P]robable cause to arrest is a complete defense to such a claim brought under either § 1983 or New York law.").  "Probable cause is established when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995)

(internal quotation marks omitted).  It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."  *United States v. Bakhtiari*, 913 F.2d 1053, 1062 (2d Cir. 1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n. 13 (1983)).  A court "must consider [only] those facts available to the officer at the time of the arrest and immediately before it."  *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks and emphasis omitted).

"[A] mistaken identity can provide the basis for probable cause."  *Martinez v. City of New York*, 340 Fed.Appx. 700, 701 (2d Cir. 2009) (citing *Hill v. California*, 401 U.S. 797, 802-03 (1971) (holding police officers have probable cause to arrest an individual with a sufficiently similar appearance to the description in a warrant)).  "If officers arrest an individual based on a mistaken identification, that arrest is still constitutionally valid if the police have probable cause to arrest the person sought and the arresting officer reasonably believed that the arrestee was that person."  *Id*.  "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."  *Curly v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001).

Further, a law enforcement officer may rely on information regarding the existence of a warrant discovered based on a search of NCIC.  *United States v. Towne*, 870 F.2d 880, 884 (2d Cir. 1989) (holding officer has probable cause to arrest defendant based on outstanding fugitive warrant appearing in the NCIC system, despite receiving information from the defendant's parole officer that the suspected charges to which the warrant pertained were resolved, where the officer personally confirmed the

warrant was still outstanding).  This is true even if it is later discovered the warrant was improperly kept in the NCIC "active" files.  *Id*. at 885.

In the instant case, assuming for the sake of this discussion, that the Officer Blatchford was the arresting officer,[18] Officer Blatchford had probable cause to arrest Plaintiff.  At the time of Plaintiff's arrest at the border, the CBP officers had knowledge through a NCIC search of an outstanding "full extradition warrant for homicide out of Kentucky," County Exh. A, and that CBP had confirmed the validity of the warrant and the Kentucky authorities' intention to extradite.  *Id*.  This information was communicated to the Buffalo Police dispatcher who requested Officer Blatchford respond to the call. *Id*.; City Exh. I at 3.  It was after receiving this information that Officer Blatchford proceeded to the border and arrested Plaintiff.  City Exh. I at 3.  Upon delivering Plaintiff to the Holding Center, the receiving Sheriff deputies also conducted a warrant search and confirmed the existence of the extradition warrant for the murder suspect from Kentucky, whom the Sheriff deputies and Officer Blatchford then believed to be Plaintiff. Nor was Officer Blatchford, or any Sheriff deputy who later received custody of Plaintiff, required to investigate Plaintiff's protestations of innocence and the paperwork Plaintiff proffered in an attempt to convince the law enforcement officials that Plaintiff was not the murder suspect.  *See Johnson v. Dobry*, 660 Fed.Appx. 69, 71 (2d Cir. 2016) ("Although [the plaintiff] alleged that he repeatedly professed innocence to [the defendant police officer] and explained that the warrant was a mistake, 'police are not

---

[18] The City argues Officer Blatchford did not arrest Plaintiff, but merely transported Plaintiff, who had already been arrested by CBP officers, from the border to the Holding Center, City's Memorandum at 18, and the County argues that deputies merely "held" Plaintiff at the Holding Center.  County's Memorandum at 8.  Regardless of the City's contention, it is fairly clear that Plaintiff remained in custody while Blatchford escorted Plaintiff to the Holding Center.

bound to credit such protestations'" (quoting *Caceres v. Port Auth.of N.Y. & N.J.*, 631 F.3d 620, 623 (2d Cir. 2011))).  *See also Curly*, 268 F.3d at 70 (arresting law enforcement officer "is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.").

Accordingly, although it was eventually determined that Plaintiff was not the murder suspect, Plaintiff's arrest and detention on the federal extradition warrant did not violate his Fourth Amendment rights.  Defendant's motions for summary judgment on Plaintiff's Third Claim alleging false arrest and false imprisonment in violation of the Fourth Amendment should be GRANTED.

## 2. Negligent Hiring, Training and Supervision (Fourth Claim)

Plaintiff's Fourth Claim is for negligent hiring, training, supervision, and supervisory liability.  Complaint, Fourth Claim.  In support of summary judgment, Defendant City argues Plaintiff makes only bald and conclusory allegations that fail to even meet the pleadings standard to proceed on this claim, City's Memorandum at 12-13, and the record is devoid of any evidence supporting any claim that the City had notice of a training or supervision deficiency.  *Id*. at 19.  The County similarly argues Plaintiff failed to allege or adduce any evidence demonstrating knowledge on the part of any officer to act improperly with regard to Plaintiff's detention in the Holding Center.  County's Memorandum at 9-11.  Plaintiff responds that there is evidence showing that Officer Blatchford and deputies at the Holding Center failed to follow the proper procedures by placing Plaintiff into the Holding Center without first booking him.  Plaintiff's Memorandum at 21.

"[T]o succeed on a theory of liability based on a failure to supervise, discipline, or train, a plaintiff must establish the requisite 'deliberate indifference' by (1) 'offer[ing] evidence from which a reasonable jury could conclude that a policy-maker knows to a moral certainty that her employees will confront a given situation;' (2) 'show[ing] that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation;' and (3) 'show[ing] that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.'" *Kosmidis v. Port Authority of New York and New Jersey*, 2021 WL 4442812, at *7 (S.D.N.Y. Sept. 28, 2021) (quoting *Green v. City of N.Y.*, 465 F.3d 65, 80-81 (2d Cir. 2006)). *See also Walker v. City of New York*, 974 F.2d 293, 297–99 (2d Cir. 1992). This standard is by design stringent, "requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (internal quotation marks and citation omitted). That is, a plaintiff must show that the municipality had notice, actual or constructive, that the inadequacy or failure to supervise was causing civil rights violations. *Id.*

Failure to train subordinate municipal employees will trigger municipal liability "only where the failure to train amounts to deliberate indifference to the rights" of members of the public with whom the employees will interact. *City of Canton v. Harris,* 489 U.S. 378, 388 (1989).  In some cases, such as the use of deadly force, the risk to the public is so obvious and so great that failure to train on the applicable constitutional limitations constitutes deliberate indifference as a matter of law.  *Id.* at 390 & n. 10. Where municipal employees "in exercising their discretion, so often violate constitutional

rights that the need for further training must have been plainly obvious to the city policymakers," the requisite deliberate indifference will be found. *Id.* at 390 n. 10. There are three elements necessary to demonstrate that a lack of training manifests deliberate indifference. *See Walker v. City of New York,* 974 F.2d 293, 297–98 (2d Cir.1992). First, to require trial, the plaintiff must offer evidence from which a reasonable jury could conclude "that a policy-make[r] knows 'to a moral certainty' that her employees will confront a given situation." *Id.* at 297 (quoting *City of Canton,* 489 U.S. at 390 n. 10). Second, "the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." *Walker,* 974 F.2d at 297. "Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at 298. Further, at the summary judgment stage, plaintiffs must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Amnesty of America v. Town of West Hartford,* 361 F.3d 113, 129 (2d Cir. 2004) (internal quotation marks omitted).

Here, Plaintiff fails to present sufficient evidence requiring trial that Defendants acted with deliberate indifference in failing to train or supervise its employees or agents regarding the procedure for processing suspects held under foreign arrest warrants. Specifically, Plaintiff fails to identify any specific training or supervisory deficiencies that caused the officers involved in his detention to erroneously hold him at the Holding Center without processing. Nor does Plaintiff point to evidence showing that

Defendants' inaction with respect to those deficiencies was the product of conscious choice rather than mere negligence. *Amnesty*, 361 F.3d at 128. Instead, Plaintiff's argument boils down to a claim that misconduct occurred and Defendants should have done more to prevent it.

Therefore, Defendants thus are entitled to summary judgment on Plaintiff's Fourth Claim.

### 3. Qualified Immunity

Defendants alternatively argue that they are entitled to qualified immunity on the § 1983 false arrest claim. Because qualified immunity does not apply to claims against municipalities, *see Sadallah v. City of Utica*, 383 F.3d 34, 37 (2d Cir. 2004) ("Qualified immunity is not available to municipalities in cases under 42 U.S.C. § 1983."), qualified immunity is irrelevant to Plaintiff's § 1983 claims against Defendants and, as no individual officers or deputies are defendants, no further discussion of qualified immunity relative to Plaintiff's § 1983 claims is required.

### E. State Law Claims

### 1. Supplemental Jurisdiction

With the dismissal of Plaintiff's federal claims pursuant to §§ 1981 and 1983, the court considers whether to exercise its discretion to retain the state law claims or to remand the state law claims to state court. "Federal district courts have supplemental jurisdiction over state-law claims that are so related to claims in the action within the courts' original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *Martin v. Sprint United Mgmt. Co.*, 2017 WL 5028621, at *2 (S.D.N.Y. Oct. 31, 2017) (internal brackets and quotation marks

omitted).  But supplemental jurisdiction is discretionary, and "a district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction."  *Id.* (internal quotation marks omitted).  In general, where all federal claims are dismissed before trial, including on summary judgment, the state claims also should be dismissed.  *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004).  In the instant case, assuming, *arguendo,* that only the state law causes of action remain unresolved, this court should exercise supplemental jurisdiction over such claims.

> The supplemental jurisdiction statute provides in relevant part that
>
> (c) [t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c)(3).

Where, as recommended here, "a federal court dismisses [or resolves on summary judgment] all claims over which it had original jurisdiction, it must reassess its jurisdiction over the case by considering several related factors—judicial economy, convenience, fairness, and comity.  *Uzan*, 388 F.3d at 56 (citing *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1191 (2d Cir.1996)).  Although generally the dismissal of all federal claims before trial warrants the dismissal of all state claims as well, "when the dismissal of the federal claim occurs late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair.  Nor is it by any means necessary."  *Uzan*, 388 F.3d at 56 (internal quotations and citations omitted)).  In the instant case, the factors weigh in favor of

exercising supplemental jurisdiction over the state law claims, particularly given the matter is before the court at the dispositive motions stage with discovery complete. Further, the court has expended considerable time on the instant summary judgment motions which required analysis of § 1983 claims that are strikingly similar to the state law claims and present no unusual questions of state law.  Under these circumstances, the court should exercise supplemental jurisdiction over the state law claims.

### 2.    Notice of Claim

Defendant City argues the state law claims Plaintiff asserts in the Complaint were not included in the required Notice of Claim Plaintiff served on the City prior to commencing this action.  City's Memorandum at 13-14.  In opposition, Plaintiff maintains the notice of claim and supplemental notice of claim sufficiently advised the City of Plaintiff's state law claims.  Plaintiff's Memorandum at 13-15.

"In federal court, state notice-of-claim statutes apply to state-law claims." *Parise v. N.Y.C. Dep't of Sanitation*, 306 F. App'x 695, 697 (2d Cir. 2009) (summary order). "Under New York law, a notice of claim is a condition precedent to bringing personal injury actions against municipal corporations," which includes the City of Buffalo. *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999); *see also Bradshaw v. City of New York*, 2017 WL 6060781, at *15 (S.D.N.Y. Dec. 7, 2017); N.Y.Gen.Mun.Law § 50-e.  The notice of claim must include, among other things, a statement of the nature of the claim, the "time when, the place where and the manner in which the claim arose," and the "items of damage or injuries claimed to have been sustained." N.Y.Gen.Mun.Law § 50-e(2).  To determine "whether a notice is sufficient," courts must focus on "whether the notice of claim included information sufficient to enable the

municipal defendant to investigate the claim and whether, based on the claimant's description, municipal authorities could locate the place, fix the time, and understand the nature of the accident." *A.W. by E.W. v. N.Y. Dep't of Educ.*, 2021 WL 611409, at *5 (E.D.N.Y. Feb. 16, 2021). These pleading requirements do not necessarily demand that a claim be explicitly identified. *See Fontaine v. City of Amsterdam*, 100 N.Y.S.3d 394, 396 (3d Dep't 2019) (where the notice "clearly identified possible culpable conduct" and thereby sufficiently alerted the defendant to the plaintiff's "potential causes of action" for false arrest, battery, and intentional neglect of medical needs, plaintiff's failure to "specifically identif[y]" those claims did not warrant dismissal). "The requirement of section 50-e need not be stated with literal nicety or exactness, and the question is simply whether the notice includes information sufficient to enable the city to investigate." *A.W. by E.W.*, 2021 WL 611409, at *5 (internal quotation marks omitted).

Based on the Complaint and Plaintiff's evidence in support of summary judgment materials, the assault and battery claim against the City relates solely to the physical force Officer Blatchford used to effectuate his allegedly unlawful arrest and detention of Plaintiff. *See* Complaint at 9-10; Plaintiff Statement of Disputed Facts-City ¶ 8. As relevant, New York law specifically provides that, "where an arrest is unlawful and without consent, the use of force in an arrest *must* give rise to a claim for assault and battery." *Greene v. City of New York*, 2019 WL 3606739, at *15 (E.D.N.Y. Aug. 6, 2019) (italics in original) (collecting cases); *see also Ferguson v. City of New York*, 2018 WL 3626427, at *2 (E.D.N.Y. July 30, 2018) ("[A]ny use of force by a police officer outside the context of a lawful seizure or arrest—regardless of the amount of force—is a

technical assault or battery."); *Johnson v. Suffolk Cty. Police Dep't*, 665 N.Y.S.2d 440,

440-41 (2d Dep't 1997).

On January 24, 2018, Plaintiff served the City with a notice of claim ("notice of

claim") (City Exh. A, Dkt. 30-4), and with a supplemental notice of claim on February 5,

2018 ("supplemental notice of claim) (City Exh. B, Dkt. 30-6).   Applying the relevant

state law, Plaintiff's notice of claim is sufficient.  The supplemental notice of claim reads

in pertinent part

> That on or about and between November 14, 2017 at approximately 6:00 PM and until November 17, 2017 at approximately 1:00 PM Claimant was falsely arrested, unlawfully imprisoned, and maliciously prosecuted by the CITY OF BUFFALO and the BUFFALO POLICE DEPARTMENT commencing at or near 1 Peace Bridge Plaza, Buffalo, New York 14213. The Respondents knew or should have known that Claimant was falsely arrested and detained wrongfully by the BUFFALO CITY POLICE and its agents, servants, and employees knew or should have known that Claimant JULIO CRUZ CAMACHO was not Antonio Sanchez and had not committed such offense[s].   Claimant JULIO CRUZ CAMACHO was ultimately released after two (2) days in jail, when the charges ended in failure. Claimant was arrested and placed into custody without probable cause or lawful justification by Respondents and maliciously prosecuted until his exoneration and released . . .

City Exh. A at 2; City Exh. C at 2.  The notice unambiguously alleges on November 14,

2017, Plaintiff was arrested, detained, and placed in custody without probable cause by

a police officer with the Buffalo Police Department.  The allegations thus "clearly

identif[y] [the] possible culpable conduct" and gave the City the ability to investigate and

understand the nature of the claimed false arrest.  *Fontaine*, 100 N.Y.S.3d at 396.

Because Plaintiff's assault and battery claim is, in substance, co-extensive with his false

arrest and unlawful imprisonment claim, any investigation into the false arrest would

have allowed the City to understand the nature of Plaintiff's assault and battery claim as

well. Thus, even without a specific reference in the legal terms to assault or battery, the notice provides enough detail to "enable the [City] to investigate the claim." *Id.*

Accordingly, Plaintiff's assault and battery claim should not be dismissed on the ground that it was not included in the notice of claim.

### 3.    False Arrest (First Claim)

In addition to his § 1983 false arrest and unlawful imprisonment claim, Plaintiff also asserts such claims under New York law. Complaint, First Claim.

### a.    Merits of Claim

As discussed, Discussion, *supra*, at 25-27, a § 1983 false arrest claim premised on the Fourth Amendment is substantially the same claim as a false arrest claim under New York law. *Weyant*, 101 F.3d at 852. Further, a false arrest claim is synonymous with a false imprisonment claim under both federal and New York law. *Jenkins*, 478 F.3d at 88. In this case, Plaintiff asserts Defendants are vicariously liable for the tortious misconduct of Blatchford (City) and unspecified Sheriff's deputies (County). Plaintiff's Undisputed Facts – City ¶¶ 3-4, 8; Plaintiff's Undisputed Facts – County ¶¶ 1.c-d, 3-4. Further, as regards the County, the County is immune from liability based on the conduct of Sheriff's deputies. *See* Discussion, *supra*, at 13-14. Accordingly, for the same reasons the court recommend summary judgment in favor of Defendants City and County on the § 1983 false arrest and unlawful imprisonment claims, Discussion, *supra*, at 25-27, the undersigned likewise recommends summary judgment should be GRANTED to Defendants on Plaintiff's state law claims for false arrest and unlawful imprisonment.

### b.    Qualified Immunity

Alternatively, Defendant City maintains it is qualifiedly immune from liability of the state common law false arrest claim.  City's Memorandum at 16-18.  Although a municipality may not avoid vicarious liability on § 1983 claims based on qualified immunity, New York law provides that where individual law enforcement officers are entitled to qualified immunity on state common law torts, the same claims asserted against the municipality based on vicarious liability must be dismissed.  *See Hargroves v. City of New York*, 2014 WL 1271024, at *3-4 (E.D.N.Y. Mar. 26, 2014) (holding where qualified immunity applied to government officials under state law, it also shield the employing municipality from vicarious liability).  "Qualified immunity shields police officers acting in their official capacity from actions for damages under both federal and New York law, unless their actions violate a clearly established right of which an objectively reasonable officer would have known."  *Pane v. Gramaglia*, 509 Fed.Appx. 101, 102 (2d Cir. 2013) (citing, *inter alia*, *Jenkins v. City of New York*, 478 F.3d 76, 86, 88 (2d Cir. 2007) (discussing qualified immunity standard under New York law)).  "The doctrine of qualified immunity serves to protect police from liability and suit when they are required to make on-the-spot judgments in tense circumstances" and when their actions could reasonably be seen as lawful.  *Myers v. Patterson*, 819 F.3d 625, 633 (2d Cir. 2016) (quoting *Lennon v. Miller,* 66 F.3d 416, 424 (1995)).

Analysis of federal qualified immunity is equally applicable to qualified immunity under New York law, which "in the context of a claim of false arrest depends on whether it was objectively reasonable for the police to believe that they had probable cause to arrest."  *Jones v. Parmley*, 465 F.3d 46, 64 (2d Cir. 2006) (citing *Boyd v. City of New*

*York,* 336 F.3d 72, 75 (2d Cir. 2003), and *Simpkin v. City of Troy,* 638 N.Y.S.2d 231, 232 (3d Dep't 1996)).  *See Hargroves*, 2014 WL 1271024, at *3-4 (where individual officers were entitled to qualified immunity on the plaintiffs' federal false arrest claim, the officers were also qualifiedly immune from liability on the plaintiffs' analogous state law claim).

In the context of a false arrest claim, qualified immunity protects an officer if he had "'arguable probable cause' to arrest the plaintiff." *Garcia v. Does,* 779 F.3d 84, 92 (2d Cir.2014).  *See also Edward ex rel. Edwards v. City of Mount Vernon*, 994 N.Y.S.2d 845, 853 (N.Y.Sup.Ct. 2014) (analyzing whether legality of arrest challenged under New York law was supported by "arguable probable cause" and citing *McColley v. County of Rensselaer*, 740 F.3d 817, 823 (2d Cir. 2014)).  "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir.2004) (internal quotation marks omitted).  "In other words, an officer lacks arguable probable cause and is not entitled to qualified immunity only where 'no officer of reasonable competence could have made the same choice in similar circumstances.'" *Myers*, 819 F.3d at 633 (quoting *Lennon,* 66 F.3d at 420–21).

Courts have held that an individual's "hit" in the NCIC database can establish probable cause for an arrest.  *See United States v. Towne*, 870 F.2d 880, 884 (2d Cir. 1989) (holding that an officer had probable cause to arrest a suspect when the officer learned of an out-of-state warrant that was mistakenly held "active" in the NCIC database); *see also Sanchez v. Port Auth. of New York & New Jersey*, 2012 WL

1068078, at *6 (E.D.N.Y. Mar. 29, 2012) ("NCIC reports are typically considered reliable and information on them has often been accepted as reasonable basis to form probable cause for an arrest.").  Even where a warrant ultimately proves invalid, a law enforcement officer's reliance on the warrant in making an arrest has been held to have been supported by arguable probable cause sufficient for qualified immunity.  *See Klein v. Glick*, 2020 WL 50974444, at *5-6 (D.Conn. Aug. 28, 2020) (NCIC search revealing extradition warrant, the validity of which was confirmed by district attorney in state seeking the fugitive provided arguable probable cause to support qualified immunity).  In the instant case, the decision of Officer Blatchford to arrest Plaintiff as well as the Sheriff deputies to receive Plaintiff into the Holding Center was supported by the existence of the federal warrant for extradition, the validity of which was confirmed by the CBP officers prior to Blatchford transporting Plaintiff to the Holding Center.  As well, the Holding Center deputies confirmed the existence of the Kentucky warrant for Sanchez.  Dep. Tr. of Anthony Diamond at 106-08; NCIC Report at 21.  Under these circumstances, Defendant City is qualifiedly immune from liability on the state law false arrest claim and even assuming the County could be liable for the Sheriff's deputies' detention of Plaintiff, such liability is alternatively defeated based on the actions of the deputies being entitled to qualified immunity.  The doctrine of qualified immunity thus provides an alternative ground for granting Defendants' Motions for summary judgment on the New York false arrest claim.

### 4.    Assault and Battery (Second Claim)

Defendants contend that Plaintiff's assault and battery claim fails because there is no evidence that any official involved in his initial detention and confinement

physically harmed Plaintiff.  Plaintiff responds that the physical force used by Officer Blatchford to detain him, as well as the strip and body-cavity searches to which he was subjected at the Holding Center, conclusively establish Defendants' liability on this claim.  The parties do not dispute that Officer Blatchford used some measure of physical force to effectuate Plaintiff's detention.  Likewise, the County does not dispute that deputies subjected Plaintiff to physical searches when he was processed into the Holding Center.

"To establish an assault claim under New York law, plaintiff must show that defendant placed the plaintiff in reasonable fear of imminent harmful or offensive bodily contact. To establish a claim for battery, the plaintiff must show that defendant intentional caused a wrongful physical contact with the plaintiff without his consent."  *5 Borough Pawn, LLC v. Marti*, 753 F. Supp. 2d 186, 200-01 (S.D.N.Y. 2010).  Where, as here, a detention is not privileged, "the use of force in [the] arrest *must* give rise to a claim for assault and battery."  *Greene*, 2019 WL 3606739, at *15 (collecting cases); *see also Evans v. Solomon*, 2010 WL 11606706, at *4 (E.D.N.Y. Aug. 11, 2010) (unprivileged search of plaintiff's person constituted battery).  In light of the undisputed facts, Officer Blatchford's contact and the deputies' physical search of Plaintiff establishes the elements of Plaintiff's assault and battery claim as a matter of law assuming such contact and search were unprivileged.

Ordinarily, the employing municipalities could be held liable for the officers' conduct.  *See Graham v. City of New York*, 928 F. Supp. 2d 610, 626 (E.D.N.Y. 2013) ("New York courts have held municipalities liable under a theory of *respondeat superior*

for . . . assault and battery claims.").  But in this case, the court concludes that neither the City nor the County may be held liable for these torts, for two reasons.

First, the court has already concluded that Plaintiff's detention and confinement were based upon probable cause and, thus, privileged or, alternatively, the officers involved are entitled to qualified immunity because under New York law it was objectively reasonable for Blatchford and the deputies to believe that Plaintiff was Antonio Sanchez and that Antonio Sanchez had an active arrest warrant.  Discussion, *supra*, at 25-29.  Because Plaintiff's assault and battery claim is derived entirely from his false arrest claim, the application of qualified immunity under New York law as to the latter claim also shields the officers, and thereby Defendants, from liability on the former claim.[19]  *See Ross v. City of New York*, 2019 WL 4805147, at *13 (E.D.N.Y. Sept. 30, 2019); *Cornett v. Brown*, 2007 WL 2743485, at *9 (E.D.N.Y. Sept.  17, 2007).

Second, as to the County, the court has already found that it may not be held liable for the torts of the deputies at the Holding Center.  *See* Discussion, *supra*, at 12-13.  That analysis applies with equal force to Plaintiff's assault and battery claim.

Accordingly, if the District Judge exercises supplemental jurisdiction as recommended, it is also recommended that summary judgment be GRANTED for Defendants on the Second Claim.

### 3.    Judgment on the Pleadings

The City's Motion includes an alternative request for judgment on the pleadings. Because the undersigned is recommending granting summary judgment in favor of both the City and the County on all claims, if the District Judge accepts the recommendation

---

[19] The court thus does not separately discuss whether the City is entitled to qualified immunity on the state assault and battery claim.

that summary judgment be GRANTED to Defendant City, then Defendant City's alternative request in the City's Motion for judgment on the pleadings should be DISMISSED as moot.

## **CONCLUSION**

Based on the foregoing, the County's Motion for summary judgment (Dkt. 29) should be GRANTED; the City's Motion (Dkt. 30) for summary judgment should be GRANTED, and DISMISSED as moot as to the alternative request for judgment on the pleadings; Plaintiff's cross-motions (Dkts. 40, 41) should be DENIED.  The Clerk of Court should be directed to close the file.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      October 14th, 2021
Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:      October 14th, 2021
            Buffalo, New York